JUDGE MARRERO  **14 CV 7691**

Counsel of Record:
ANDREW M. CALAMARI
REGIONAL DIRECTOR
MICHAEL D. PALEY
JACK KAUFMAN
KATHERINE S. BROMBERG
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0106 (Kaufman)
Email: **kaufmanja@sec.gov**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

-against-

MICHAEL S. PAGNANO and HEATHROW NATURAL FOOD & BEVERAGE, INC.

                Defendants.

14 Civ. _____ (____)

**COMPLAINT**

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendants Michael S. Pagnano ("Pagnano") and Heathrow Natural Food & Beverage, Inc. ("Heathrow") (collectively "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. This action involves a fraudulent pump-and-dump scheme conducted by Heathrow CEO Pagnano. From at least March 2009 through February 2011, Pagnano caused Heathrow illegally to issue unrestricted Heathrow stock to the general public, while at the same

time causing Heathrow to issue false and misleading press releases concerning the company's operations and business prospects. Pagnano personally profited from these illegal activities by selling his own Heathrow stock into the market.

2. During the relevant period, Heathrow claimed to be a manufacturer and distributer of health foods, and its stock was quoted publicly on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc. As Heathrow's sole owner, CEO, and President, Pagnano controlled the company and its activities. Beginning in March 2009, Pagnano caused Heathrow to issue a series of materially false and misleading press releases announcing, for example, sales of products that Heathrow did not manufacture, baseless revenue projections, and non-existent distribution agreements with national retail chains. At the same time, Heathrow failed to disclose that, in fact, its operations were contingent on it obtaining significant financing, which never materialized.

3. Heathrow's false and misleading press releases stimulated demand for Heathrow stock, supporting its share price and significantly increasing its trading volume. During the same time period that he was issuing those press releases, Pagnano sold over 877 million shares of his own Heathrow stock, earning personal profits of over $150,000. Pagnano sold his own Heathrow stock while in possession of material non-public information concerning the falsity of those press releases.

4. In addition to the above fraudulent activities, from March 2009 through June 2011, Pagnano and Heathrow participated in the illegal issuance of over 5 billion unrestricted Heathrow shares – for which no registration statement was in effect and for which no exemption from registration was available – to Pagnano and others, in violation of the registration requirements of the federal securities laws.

2

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.  As a result of the activities described herein, Defendants violated Sections 5(a), 5(c), and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), e(c), and q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.  The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act, [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (a) permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged herein; (b) requiring Defendants to disgorge the ill-gotten gains they received as a result of their violations, and to pay prejudgment interest thereon; (c) barring Pagnano from participating in future penny stock offerings pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; (d) barring Pagnano from serving as an officer or director of publicly traded companies pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) imposing civil monetary penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.  Venue lies in this District pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of business constituting the

violations alleged herein occurred within the Southern District of New York. OTC Link, the electronic interdealer quotation system upon which Heathrow shares were quoted, was located at all relevant times in New York, New York. During the relevant period, a number of investors in the Heathrow shares were located in New York, New York.

9. Pagnano and Heathrow have, directly and indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

10. **Michael Pagnano**, age 64, is a resident of Lake Mary, Florida.

11. **Heathrow** is a Delaware corporation with its principal place of business in Lake Mary, Florida, at Pagnano's residence.

## FACTS

### I. Heathrow and Pagnano's Fraudulent Press Releases

12. In 2003, Pagnano became the sole owner, president, and chief executive of a public shell company called The World Golf League, Inc. ("WGL"), which purported to create a golf event for television.

13. In early 2009, Pagnano changed WGL's name to Heathrow and changed its purported business to the manufacture and distribution of nutrient-infused foods. However, the only products that Heathrow ever produced were two gums – "Acai Plus" and "Resveratrol Plus" – and the company never developed beyond the initial start-up phase. Heathrow never possessed capital remotely adequate to fulfill its purported business plan; it manufactured only limited quantities of gum (at most, only $50,000-worth); and it never developed any other products (despite its claims to do so). Furthermore, Heathrow never had any agreements with any major

retailer, other than an isolated and unsuccessful "trial" at a few GNC stores.

14. Notwithstanding Heathrow's poor results and, at best, highly questionable prospects, from March 2009 through December 2010, Pagnano personally authored and issued on behalf of Heathrow numerous materially false and misleading press releases announcing millions of dollars in projected earnings, and other positive alleged business developments, designed to create the false impression that Heathrow was a vital and growing company.

15. During that same time, Pagnano issued over a billion shares of Heathrow stock to himself and sold them regularly to the public, while in possession of material nonpublic information about the actual condition of the company. By February 2011 Pagnano had sold over 877 million shares for personal proceeds of over $150,000. Pagnano typically sold his Heathrow shares shortly after issuing one of his false or misleading press releases.

16. Below is a description of the false and misleading Heathrow press release announcements that Pagnano authored and issued. At the time he issued each press release, Pagnano knew or recklessly disregarded that each contained the false and misleading statements and material omissions of fact described below.

17. On March 10 and 19, 2009, Heathrow falsely and misleadingly announced that "Exfuze, the very popular multi botanical nutritional drink, will continue to be [Heathrow's] flagship product" and on March 24, 2009 that "Heathrow is a national distributor of natural food products such as Exfuze, a very popular nutritional beverage of the Heathrow Natural line of Super Food Products." As Pagnano knew or recklessly disregarded at the time of these announcements, however, "Exfuze" was not a Heathrow product. In addition, in press releases issued on March 9, 2009, March 16, 2009, March 24, 2009, March 27, 2009, March 31, 2009, April 6, 2009, April 9, 2009, April 13, 2009, April 15, 2009, April 16, 2009, April 21, 2009,

April 27, 2009, April 28, 2009, May 4, 2009, May 5, 2009, May 8, 2009, May 12, 2009, May 18, 2009, and May 21, 2009, Heathrow falsely stated either that it "is a national distributor of natural food products such as Exfuze, a very popular nutritional beverage and the Heathrow Natural line of Super Food Products," or that it "is an independent national distributor of natural food products such as Exfuze, a very popular botanical nutritional." As Pagnano knew or recklessly disregarded at the time of these announcements, however, Heathrow was not a distributor of Exfuze, and Heathrow had not produced any item in the "Heathrow Natural line of Super Food products."

18.  In press releases issued May 29, 2009, June 2, 2009, June 4, 2009, June 9, 2009, June 11, 2009, June 29, 2009, July 1, 2009, July 14, 2009, August 11, 2009, September 8, 2009, September 16, 2009, November 10, 2009, November 24, 2009, December 2, 2009, December 8, 2009, December 11, 2009, December 17, 2009, January 5, 2010, January 20, 2010, January 27, 2010, February 22, 2010, and February 25, 2010, Heathrow falsely stated that "Heathrow Natural Food & Beverage, Inc. (HNFB) is a national distributor of the botanical Super Food beverage, Exfuze Seven + and Exfuze Seven + Pro as well as the Heathrow Super Food Brand." Heathrow further falsely described its "Super Food Brand" in the above press releases as including a "Food Bar" and "Snack Chips." As Pagnano knew or recklessly disregarded at the time of these announcements, however, Heathrow was not a distributor of any "Exfuze" product, and Heathrow never produced and distributed either a "Food Bar" or "Snack Chips."

19.  On March 24, 2009, Heathrow misleadingly announced that it "projects revenue for 2009 to exceed $2.7 Million," based "on compensation and commissions related to the sales of Exfuze . . . and the national distribution and sales of Heathrow Natural Acai Berry chewing gum, the Heathrow Natural Super Food Bar and Heathrow Natural Super Food Snack products."

6

As Pagnano knew or recklessly disregarded at the time, however, Heathrow was not a distributor of Exfuze and had never received any compensation from any Exfuze sale. As Pagnano also knew at that time, but misleadingly failed to disclose, Heathrow did not yet have any product in production, and any such production was contingent on Heathrow's obtaining sufficient capital to manufacture product. Indeed, at that time, Heathrow did not possess capital remotely sufficient to produce the amount of product necessary to generate its projected $2.7 million in revenue.

20. On April 13, 2009, Heathrow falsely and misleadingly announced that "its sales of the nutritional super drink Exfuze Seven + and Exfuze Seven + Pro . . . are growing at fifteen percent per month. At this pace, [Heathrow] projects sales for Exfuze to top $2 Million Dollars for 2009." As Pagnano knew or recklessly disregarded at the time, contrary to the implication of the April 13 press release, "Exfuze" was not a Heathrow product, nor was Heathrow in the business of selling any Exfuze product.

21. On April 21, 2009, Heathrow falsely and misleadingly announced, that "it will begin a national media campaign within the next 30 days to promote its Exfuze Brand as well as the Heathrow Natural Super Food Brand." As Pagnano knew or recklessly disregarded at the time, contrary to the implication of the April 13 press release, "Exfuze" was not a Heathrow product, nor was Heathrow in the business of selling any Exfuze product.

22. On April 28, 2009, Heathrow misleadingly announced that "[Heathrow] is projecting to sell 1.4 million units of its Super Food ACAI Plus chewing gum in 2009 for gross revenue of $3,486,000" and that "[t]he current projections include standard distribution channels such as convenience stores, drug chains and super markets." However, as Pagnano knew or recklessly disregarded at the time but failed to disclose, Heathrow had not yet manufactured any

product and did not possess capital or financing remotely sufficient to manufacture such large volumes of product.

23. On May 8, 2009, Heathrow issued a press release falsely announcing that distribution of ACAI Plus chewing gum "will begin in August 2009" and that "[i]nitial distribution will be for 500,000 units." However, as Pagnano knew or recklessly disregarded at the time but failed to disclose, Heathrow had not yet manufactured any product and did not possess capital or financing remotely sufficient to manufacture 500,000 units of product.

24. On May 21, 2009, Heathrow misleadingly announced that it "expects to sell 1.4 million units in the U. S. in 2009 and 1/2 million units in the U.K. & Ireland." On May 29, 2009, Heathrow again misleadingly announced that "it expects to ship over 1.4 million units in the United States and 500,000 units in the UK & Ireland in 2009." At the time, as Pagnano knew or recklessly disregarded but failed to disclose, Heathrow had not yet manufactured any product and did not possess capital or financing remotely sufficient to manufacture 1.9 million units of gum.

25. On June 4, 2009, Heathrow falsely announced that "unit sales for 2009 are expected to reach 4.7 million units," and "[d]emand from distributors for our functional gum, ACAI Plus, has been overwhelming." At the time, Pagnano neither expected to sell 4.7 million units of gum in 2009, nor believed that demand for Heathrow's gum was overwhelming. To the contrary, Pagnano knew or recklessly disregarded that there was no demand for the gum because Heathrow had not received any purchase orders. Pagnano further knew or recklessly disregarded that Heathrow was unable to sell 4.7 million units of gum. Heathrow had not yet manufactured any product and did not have capital or financing remotely sufficient to produce 4.7 million units of gum.

8

26. On June 11, 2009, Heathrow falsely stated that it had "completed the formulation for two new Super Food products, 'ACAI Plus Power Bar' and 'ACAI Plus Power Chips' which will be introduced to the retail market in the 1st quarter 2010." At the time, Pagnano knew that Heathrow was not ready to bring these products to market in the first quarter of 2010. Pagnano knew at the time, but failed to disclose, that Heathrow had not manufactured any product and did not have capital or financing remotely sufficient to produce the ACAI Plus Power Bar or the ACAI Plus Power Chips in time to go to retail in the 1st quarter of 2010. In fact, Heathrow never finalized the formulation of the ACAI Plus Power Bar, never even manufactured a test run of the ACAI Plus Power Chips, and never sold either the ACAI Plus Power Bar or the ACAI Plus Power Chips. In addition, Pagnano knew or recklessly disregarded well before the 1st quarter of 2010 that Heathrow had not obtained the financing necessary to manufacture the ACAI Plus Power Bar or the ACAI Plus Power Chips, but he nonetheless misleadingly failed to update Heathrow's earlier misstatements.

27. On June 29, 2009, Pagnano misleadingly stated that "[Heathrow] expects to ship 500,000 units of gum to the [sic] Australia in 2009." At the time, as Pagnano knew or recklessly disregarded but failed to disclose, Heathrow had not yet manufactured any product, and did not possess capital or financing remotely sufficient to manufacture 500,000 units of product.

28. On July 1, 2009, Heathrow misleadingly announced that it "expects to ship four million units of gum over the first six months of distribution." At the time, as Pagnano knew or recklessly disregarded but failed to disclose, Heathrow had not yet manufactured any product, and it did not possess capital or financing remotely sufficient to manufacture four million units of gum.

29. On September 8, 2009, Heathrow falsely announced that it had "ordered an initial

production run of 250,000 units [of gum] and expects to ship over four million units of ACAI Plus over the next 12 months." The press release further falsely states that the "distribution of Resveratrol Plus will be the same as ACAI Plus and we expect to ship an equal amount over the next twelve months." At the time, as Pagnano knew or recklessly disregarded, Heathrow had not ordered a production run of 250,000 units of gum. Moreover, and to the contrary, as Pagnano knew or recklessly disregarded, Heathrow did not have capital or financing remotely sufficient to produce these quantities of gum. In fact, the "initial production run" was actually a 5,000-unit test run, and, at most, only 25,000 units of ACAI Plus and Resveratrol gum combined were ever manufactured.

30. On October 8, 2009, Heathrow falsely announced that "the distribution of Acai Plus and Resveratrol Plus is scheduled to begin in the middle of November 2009 with production running at 200,000 units per month per brand." As Pagnano knew or recklessly disregarded at the time but failed to disclose, Heathrow did not have capital or financing remotely sufficient to produce these quantities of gum.

31. In addition, Pagnano knew or recklessly disregarded, well before the end of 2009, that Heathrow had not obtained the financing necessary to generate its projected revenue, as per its press releases quoted in paragraphs 19, 20, and 22 above, or to manufacture its projected volume of gum, as per its press releases quoted in paragraphs 23-25 and 27-30 above. Nonetheless, he misleadingly failed to update Heathrow's earlier press release projections and misstatements. In fact, Heathrow ultimately manufactured a total of, at most, only 25,000 units of Acai Plus and Resveratrol Plus chewing gum (which Heathrow priced at $2 per unit).

32. On December 2, 2009, Heathrow issued the following false announcement: "Heathrow Natural Food & Beverage, Inc. Receives $1.5 Million Order for ACAI Plus to be

10

Distributed to the FIFA 2010 World Cup." The press release further falsely and misleadingly stated:

> [Heathrow] is pleased to announce that it has entered into a contract with the African Aid Network (www.africanaidnetwork.org) for 80,000 cartons of ACAI Plus anti-oxidant gum which represents 960,000 individual units. The gum will be distributed at the FIFA 2010 World Cup in Cape Town, South Africa (www.fifa.com/worldcup) beginning in June 2010. The FIFA World Cup is held every four years and is the largest and most watched sporting event in the world. Thirty-two countries representing every continent in the world will vie for the World Cup and Soccer supremacy.
>
> 'This is a major milestone for Heathrow Natural Super Food Brand and the exposure to be gained at the 2010 World Cup is priceless. The monetary value of the order is insignificant compared to the brand awareness for ACAI Plus, which will be used by consumers from every part of the world at the event. We are delighted that the African Aid Network has chosen ACAI Plus based on its nutritional value and unique delivery system to provide players and fans alike with super functional nutrients,' said Michael Pagnano, CEO.

In fact, no such order actually existed or was ever filled. Furthermore, Pagnano knew or recklessly disregarded – at the time he issued the December 2 press release, or at the latest, shortly thereafter – that no such order actually existed. Nonetheless, neither Heathrow nor Pagnano took any steps to retract or otherwise correct the December 2 press release, which remained available to the public well beyond the date that Pagnano was aware of its falsity.

33. On December 8, 2009, Heathrow falsely announced that it "expects to deliver over 6 million units of its Super Food Brand over the next 12 months, which include both the ACAI Plus & Resveratrol Plus brand of gum and natural fruit bars. Additionally, [Heathrow] will deliver approximately one million units of ACAI Plus to be distributed at the 2010 World Cup Games in Capetown, South Africa beginning in June 2010." As Pagnano knew or recklessly disregarded at the time but failed to disclose, Heathrow did not have capital or

financing remotely sufficient to produce six million units of its "Super Food Brand." Furthermore, as explained in the preceding paragraph, Heathrow had no actual order to deliver product for the 2010 World Cup, and Pagnano either knew or recklessly disregarded this fact at the time of the December 8 press release or, at the latest, shortly thereafter (but took no steps to retract or otherwise correct any part of the December 8 press release, which remained available to the public well beyond the date that Pagnano was aware of its falsity).

34. On January 5, 2010, Heathrow falsely and misleadingly announced that: "[Heathrow] expects sales of its Super Food Anti-Oxidant Gum Brands & Natural Fruit Bars to exceed $10 Million Dollars for 2010" and that "[b]oth products are set to roll out over the next thirty days and will be available in major retail outlets around the country. International distribution will begin in 2nd quarter of 2010 and include Canada, Western Europe, Eastern Europe, Japan, Australia, China, and Western Africa." At the time of that announcement, as Pagnano knew or recklessly disregarded but failed to disclose, its products were not "set to roll out over the next thirty days" and could not have been "available in major retail outlets around the country" (or around the world for that matter) in that amount of time: Heathrow had not sold any products as of January 5, 2010; it did not have a formal agreement with any retailer; it did not possess capital or financing remotely sufficient to manufacture, distribute or sell the amount of product necessary to generate its "expected" $10 million in revenue; it had not yet manufactured Natural Fruit Bars; it had only manufactured, at most, 25,000 units of Super Food Anti-Oxidant Gum Brands; and it had no additional capital or financing to manufacture more gum or other product.

35. On December 20, 2010, Heathrow falsely and misleadingly announced that "[t]he company expects to ship over three million dollars in production orders to five retailers in the 1st

quarter of 2011," and that "[i]n fact, Heathrow Natural Food & Beverage, Inc. has upgraded its 2011 revenue projections to $10-12 Million across all product lines." At the time, as Pagnano knew or recklessly disregarded but failed to disclose, Heathrow's revenues for 2010 were, at most, $40,000-50,000, the largest purchase order Heathrow had received was $1,500, and Heathrow did not possess capital or financing remotely sufficient to manufacture the large volume of product necessary to generate over three million dollars in production orders in the 1st quarter of 2011. Furthermore, Heathrow based its revenue projections on projected distribution agreements with major retailers, some of which already had rejected Heathrow's products as of the date of the December 20 announcement.

36. On December 21, 2010, Heathrow falsely and misleadingly announced that "Heathrow Natural Food & Beverage, Inc. Projects Fiscal 2011 Revenues at $15 Million." At the time, as Pagnano knew or recklessly disregarded but failed to disclose, Heathrow's actual revenues for 2010 were, at most, $40,000-50,000, the largest purchase order Heathrow had received for its products was for $1,500, and Pagnano knew or recklessly disregarded, but failed to disclose, that Heathrow did not possess capital remotely sufficient to manufacture the large volumes of product necessary to produce $15 million in production orders in 2011. Heathrow had obtained no capital or financing between December 20 and December 21 that would have altered the above facts in any way. Further, Heathrow was basing its revenue projections on distribution agreements with major retailers, some of which had rejected Heathrow's products as of the date of this announcement.

37. In addition, Pagnano knew or recklessly disregarded, well before the end of 2010 and the first quarter of 2011, that Heathrow had not obtained the financing necessary to manufacture its projected volume of units of gum and generate its projected revenue referenced

13

in paragraphs 33-36 above. Nonetheless, Pagnano misleadingly failed to update Heathrow's earlier misstatements.

## II. Illegal Stock Issuances

38. Starting in March 2009 – at the same time that he was issuing the false and misleading press releases described above – on at least 54 separate occasions, Pagnano also repeatedly and illegally directed Heathrow's transfer agent to issue large quantities of unrestricted Heathrow shares – for which no registration statement was in effect and for which no registration exemption applied – to numerous recipients, including Pagnano himself.

39. The transfer agent was responsible for issuing and transferring Heathrow's stock shares upon request from the issuer. As Pagnano knew or recklessly disregarded, Heathrow stock could not be resold if the stock certificates bore a "restrictive legend." A "restrictive legend" is a legend the transfer agent places on stock certificates stating, among other things, that the shares represented by those certificates (a) have not been registered under the Securities Act; (b) are "restricted securities" as that term is defined in Securities Act Rule 144; and (c) may not be offered for sale, sold, or otherwise transferred except pursuant to registration or an exemption from registration "the availability of which is to be established to the satisfaction of" the company issuing the shares (in this case, Heathrow).

40. As a prerequisite to issuing shares of a company's stock without a "restrictive legend" (also known as "unrestricted" stock), the transfer agent required the company to submit a legal opinion stating that the requested shares could be issued on an unrestricted basis.

41. Pagnano repeatedly presented the transfer agent with two attorney opinion letters that were plainly inapplicable to Pagnano's 54 separate requests to the transfer agent to issue unrestricted shares of Heathrow stock to himself and others. The two opinion letters, dated

February 29, 2008 and March 31, 2009 (the "Opinion Letters"), pertained solely to shares issued to a particular investor ("Investor A"). However, none of the 54 issuances for which Pagnano sought to use the Opinion Letters pertained to Investor A. As no registration statement was in effect for the Heathrow stock, and no registration exemption applied, none of Pagnano's requested stock issuances complied with Section 5 of the Securities Act.

42.    Thus, Pagnano's improper requests for stock issuances and presentation of the Opinion Letters to the transfer agent 54 times between March 2009 and June 2011, for issuance of stock to persons and entities other than Investor A – including requests to issuance over a billion shares to himself (an affiliate of Heathrow, the issuer) – violated Section 5 of the Securities Act.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 17(a)(1)-(3) of the Securities Act)
(Against Pagnano and Heathrow)

43.    The Commission realleges and incorporates paragraphs 1 through 42 by reference as if fully set forth herein.

44.    By engaging in the acts and conduct described in this Complaint – issuing the false press releases described above – Pagnano and Heathrow, by use of any means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, in the offer or sale of securities have:

    a.    Employed devices, schemes, and artifices to defraud;

    b.    Obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

  c. Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

45. Pagnano and Heathrow (through Pagnano) engaged in the above conduct knowingly or recklessly.

46. By virtue of the foregoing, Pagnano and Heathrow, directly or indirectly, have violated, and unless restrained and enjoined, will continue to violate, Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (b) hereunder)
(Against Pagnano and Heathrow)

47. The Commission realleges and incorporates paragraphs 1 through 42 by reference as if fully set forth herein.

48. By virtue of the foregoing, Pagnano and Heathrow, directly or indirectly, singly or in concert, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities with scienter:

  a. Employed devices, schemes and artifices to defraud;

  b. Made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and

  c. Engaged in acts, practices and courses of business that would operate as a fraud or deceit upon any person.

49. Pagnano violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (b) thereunder [17 C.F.R. § 240.10b-5(a) and (b)] by issuing press releases

containing untrue statements of materials facts and omissions of material facts necessary to make statements made not misleading, and by selling his own Heathrow stock while in possession of material non-public information concerning the falsity of those press releases.

50. By reason of the foregoing, Pagnano and Heathrow, directly or indirectly, singly or in concert, violated, and unless enjoined, will violate again, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (b) thereunder [17 C.F.R. § 240.10b-5(a) and (b)].

### THIRD CLAIM FOR RELIEF

**(Sale of Unregistered Securities in Violation of Section 5(a) and (c) of the Securities Act)**
(Against Pagnano and Heathrow)

51. Paragraphs 1 through 42 are realleged and reincorporated by reference as if fully set forth herein.

52. The shares of Heathrow that Defendants offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

53. Pagnano and Heathrow, directly or indirectly, singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

54. By reason of the foregoing, Pagnano and Heathrow have violated and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter final judgments against the Defendants granting the following relief:

### I.

Finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged herein.

### II.

Permanently restraining and enjoining Defendants Heathrow and Pagano, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Sections 5(a), 5(c), and Section 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), e(c), and q(a)].

### III.

Permanently restraining and enjoining Defendants Heathrow and Pagano, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### IV.

Directing Defendants Pagano and Heathrow to disgorge, with prejudgment interest thereon, all ill-gotten gains, received directly or indirectly as a result of the misconduct alleged herein, jointly and severally, and such other and further amount as the Court may find appropriate.

V.

Directing Defendants Pagano and Heathrow to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

VI.

Enjoining and restraining Pagnano from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

VII.

Barring Pagnano from serving as an officer or director of any public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VIII.

Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 23, 2014

                                           /s/ Andrew M. Calamari
                                           Andrew M. Calamari
                                           Michael D. Paley
                                           Jack Kaufman
                                           Katherine S. Bromberg

                                           SECURITIES AND EXCHANGE COMMISSION
                                           New York Regional Office
                                           Brookfield Place
                                           200 Vesey Street, Suite 400
                                           New York, New York 10281-1022
                                           (212) 336-0106 (Kaufman)
                                           Email: kaufmanja@SEC.gov